Granville AMOS; Harvey W. Bloxom; Michael A. Holt; Teddy T. Jones; Charles Madison; Howard Megginson; Boris Prymeran; Gary Ralph; John Smith; Michael Hilman Smith; William Lewis Smith; Calvin J. Whiting; Dennis Brian Absher, Plaintiffs–Appellants,

and

Winfried Lee Rhodes, Plaintiff,

v.

MARYLAND DEPT. OF PUBLIC SAFETY AND CORRECTIONAL SERVICES; Roxbury Correctional Institution, Hagerstown, Maryland; Richard Lanham, Sr., in his official capacity as Commissioner, Maryland Division of Correction;

John P. Galley, in his official capacity as Warden, Roxbury Correctional Institution; Ronald Moats, Warden, Roxbury Correctional Institution; William Smith, Warden, Maryland House of Correction, Defendants–Appellees.

United States of America, Amicus Curiae.

No. 96–7091.

United States Court of Appeals, Fourth Circuit.

Argued April 10, 1997.

Decided Sept. 22, 1997.

**ARGUED:** Marjorie Lynn Rifkin, National Prison Project, ACLU Foundation, Washington, DC; Andrew Marc Dansicker, Hoguet, Newman & Regal, New York City, for Appellants. John Burnside Howard, Jr., Assistant Attorney General, Office of the Attorney General, Baltimore, MD, for Appellees. **ON BRIEF:** Margaret Winter, Eric Balaban, National Prison Project, ACLU Foundation, Washington, DC, for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Carmen M. Shepard, Assistant Attorney General, Stephanie Lane–Weber, Assistant Attorney General, Baltimore, MD, for Appellees. Deval L. Patrick, Assistant Attorney General, David K. Flynn, Lisa Wilson Edwards, Linda F. Thome, United States Department of Justice, Washington, DC, for Amicus Curiae.

Before MURNAGHAN and WILLIAMS, Circuit Judges, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Senior Judge CLARKE joined. Judge MURNAGHAN wrote an opinion dissenting in part.

## OPINION

WILLIAMS, Circuit Judge:

Thirteen disabled Maryland state prisoners incarcerated at the Roxbury Correctional Institution (RCI) in Hagerstown, Maryland, brought this suit against RCI; the Maryland Department of Public Safety and Correctional Services (MDPSCS); Richard Lanham, the Commissioner of the Maryland Division

of Correction; and John P. Galley, the Warden of RCI (collectively Appellees). The prisoners complain, *inter alia*, that Appellees (1) denied them the opportunity to participate in work release and pre-release programs because of their disabilities, resulting in a denial of benefits, training, and rehabilitation, and in longer sentences; (2) denied them equal access to bathrooms, athletic facilities, the "honor tier," and food services at RCI because of their disabilities; (3) denied them adequate medical attention and hygienic facilities; (4) failed to make reasonable accommodations to ensure the safety of disabled inmates; and (5) assigned them to RCI because of their disabilities, thereby depriving them of the opportunity to serve their sentences at available facilities closer to their homes. The prisoners claim that Appellees' conduct violated Title II of the Americans with Disabilities Act (ADA), *see* 42 U.S.C.A. §§ 12131–12165 (West 1995 & Supp.1997); § 504 of the Rehabilitation Act of 1973, *see* 29 U.S.C.A. § 794 (West Supp.1997). The prisoners also brought suit under 42 U.S.C.A. § 1983 (West Supp.1997), claiming that Appellees' conduct violated the Eighth Amendment of the United States Constitution.

The district court granted summary judgment for Appellees. Relying on our decision in *Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995), the district court concluded that the ADA and the Rehabilitation Act do not apply to state correctional facilities. We agree. After painstakingly reexamining our decision in *Torcasio,* we are convinced that *Torcasio*'s analysis of the issue is, indeed, compelling, and that the Rehabilitation Act and the ADA do not apply in the state prison context. Nothing in the opinions of those courts holding to the contrary even begins to refute the careful analysis we undertook in *Torcasio.* In reaching the conclusion that these Acts do not apply, and could not possibly be applied in the context of prison facilities, we are (and we believe that the Supreme Court will ultimately find itself) persuaded in no small measure by the extraordinarily circuitous statutory analyses which those courts reaching the contrary conclusion have undertaken and the considerable extra-interpretive energies that those

courts have been forced to expend in order to limit the systemic chaos that would otherwise have followed on their holdings that these statutes apply to the Nation's myriad state prisons. In addition, the district court determined that the prisoners had failed to raise genuine issues of fact material on the question of whether their keepers were deliberately indifferent to their serious medical needs. Again, we agree. Accordingly, we affirm the district court's grant of summary judgment for Appellees on the prisoners' statutory and constitutional claims.

I.

Although Appellees dispute many of the factual allegations made by the prisoners, we set forth the facts in the light most favorable to the prisoners for purposes of evaluating the appropriateness of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (holding that in determining whether summary judgment is appropriate, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"); *see also* Fed. R.Civ.P. 56(c). Because we conclude that the ADA and the Rehabilitation Act do not apply to state prisons, we recite only the facts relevant to the prisoners' constitutional claims.

Prisoners at RCI, disabled and non-disabled alike, receive medical attention when necessary from Prison Health Services, Inc. (PHS), a private medical care contractor. PHS provides a broad array of medical services, including general dispensary services, sick-call services, and infirmary services. In addition, PHS uses Washington County Hospital as an adjunct medical care provider for medical services that cannot be performed at the prison.

Prisoners may complain about the medical care provided (or not provided) through an Administrative Remedy Procedure (ARP) in place at the prison. Pursuant to this procedure, a prisoner fills out an ARP form to complain about medical care he has received or to request medical attention, which is transmitted to the Warden. The Warden

then forwards the complaint or request to his administrative remedy coordinator for investigation and resolution.

Six of the thirteen disabled prisoners in this case—Granville Amos, William Smith, Michael Smith, Howard Megginson, Gary Ralph, and Boris Prymerman—contend that prison officials were deliberately indifferent to their serious medical needs in violation of the Eighth Amendment.[1] Appellant Granville Amos, who is partially paralyzed as the result of a 1989 gunshot wound, filed six ARPs with the Warden between June 3, 1991, and November 22, 1991, complaining that he was not receiving in a timely fashion medication for back pain and spasms. In each instance, the Warden promptly responded to Amos' complaint by acknowledging "that a gap in your medication did occur with the Dispensary at least partially responsible," and by assuring Amos that steps were being taken to "decrease the possibility of a reoccurrence of this problem." (J.A. at 869.) The Warden informed Amos that he was "directing the CMS Medical Provider to *insure* [sic] that this does not reoccur." (J.A. at 872.) In response to Amos' final ARP, the Warden stated:

> In spite of all efforts by staff, the problems with prescription medications has [sic] persisted through most of November due to the non-delivery by the Pharmacy. It is recognized that these difficulties do not negate the medical suppliers [sic] obligation to provide these medications. The new Pharmacy is now on line and it is anticipated that a dramatic lessening of lapses of this type will occur.

(J.A. at 888.)

Appellant William Smith is partially paralyzed and wheelchair dependent, and suffers from bilateral carpal tunnel syndrome, hypertension, and lymphocytic leukemia. In 1992, a physician suggested that Smith consider undergoing surgery to correct his carpal tunnel syndrome. Unidentified prison employees then told Smith that he had been scheduled for carpal tunnel surgery, but the surgery was never performed. In addition,

in 1992, a physician recommended diagnostic tests to ascertain the cause of Smith's back pain. Like the surgery, the tests have never been performed.

Appellant Michael Smith, also paralyzed and confined to a wheelchair, suffers from chronic back pain, hypertension, and bladder problems. In 1988, he was prescribed Valium to prevent leg spasms, and received Valium until his release from prison in 1991. In 1993, he was incarcerated again, first at the Maryland Penitentiary, and then, beginning in December 1994, at RCI. Although Smith received Valium while incarcerated at the Maryland Penitentiary, medical staff at RCI prescribed substitute medication that was not as effective as Valium. Smith submitted two "Sick–Call Request & Encounter Forms," one on December 9, 1995, and another on March 14, 1995. Each requested that a physician see him about the problem with his medication. On March 17, 1995, Dr. Charles E. Potts of the prison medical staff wrote to Smith that he would "arrange for a meeting with you next week to address your concerns." (J.A. at 866.) A few weeks later, in April 1995, Smith's Valium prescription was renewed.

Appellant Howard Megginson, also paralyzed and confined to a wheelchair, suffered recurrent urinary tract infections while imprisoned at RCI. He filed two ARPs "concerning the urine [sic] infection." (J.A. at 727.) In both instances, according to his own testimony, in response to the ARPs, he was seen and treated by physicians.

Appellant Gary Ralph has "cerebral palsy, [a] history of a femoral fracture, and chronic back pain." (J.A. at 602.) In June 1995, he began experiencing severe back and leg pain. At some point, after he began experiencing back and leg pain, Ralph filed ARPs informing the Warden of his condition and need for medical attention. As of June 27, 1995, Ralph was no longer assigned to RCI. In August 1995, Ralph received treatment at the University of Maryland Hospital where further diagnostic testing was recommended. Subsequently, "[s]pecialists have recom-

---

1. The claims of the remaining prisoners were brought solely under the Rehabilitation Act and the ADA.

mended conservative treatment for [Ralph's] lumbosacral disc disease. [Ralph] is receiving chronic pain medications and will have ongoing neurosurgical evaluations at the University of Maryland to provide speciality consultation." (J.A. at 602.)

Appellant Prymerman, who has "a lumbosacral fracture with chronic back pain" (J.A. at 602), "can walk with [a] cane or crutches, but uses [a] wheelchair most of [the] time due to pain" (J.A. at 830). On November 7, 1991, Dr. Donald Patterson recommended surgery for his back problem. A notation on Prymerman's medical chart, dated December 1, 1992, states: "[S]till waiting on spinal fusion decision by Dr. Patterson. He (Mr. Prymerman) continues complaining of severe pain." (J.A. at 830.) Prymerman never filed an ARP regarding the recommended back surgery.

## II.

■ We begin with the statutory claims.[2] In granting summary judgment for Maryland on the prisoners' ADA and Rehabilitation Act claims, the district court stated, citing our decision in *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995), that "a three-judge panel of the Fourth Circuit strongly stated its view that those Acts do not apply to state prisons." (J.A. at 41.) The district court concluded that our treatment in *Torcasio* of the applicability of the ADA and the Rehabilitation Act to state prisons was not controlling, but nevertheless decided "that considerations of sound judicial management and prudent use of resources dictate that I follow the *Torcasio* dictum." (J.A. at 41.) The court stated that if "the Fourth Circuit concludes on appeal in this case that the *Torcasio*

dictum was incorrect, the case will simply be remanded for further proceedings." (J.A. at 41.)[3]

The prisoners contend "that the view expressed by this Court in *Torcasio*, that the statutes do not apply to prisons and prisoners, was incorrect." (Appellants' Br. at 20.) They claim that the ADA and the Rehabilitation Act apply to state prisons because both statutes are written in broad terms that clearly encompass state correctional facilities. Even if the coverage of the statutes is ambiguous, they argue, "any such ambiguity is entirely overcome by regulations promulgated by the [Department of Justice], to which Congress delegated the authority to implement the statutes." (Appellants' Br. at 20.)[4] Like the prisoners, the amicus curiae Department of Justice (DOJ) contends that the plain language of both statutes establishes that the statutes apply to state prisons, that DOJ regulations confirm that the statutes apply to state prisons, and that our discussion of the applicability of the statutes to state prisons in *Torcasio* was poorly reasoned dictum that should not control the outcome of this case. (DOJ Br. at 5–21.)

In *Torcasio*, the principal issue was whether it was clearly established at the time the plaintiff in that case was imprisoned that Title II of the ADA and § 504 of the Rehabilitation Act apply to state prisons, and whether the individual defendants in that case were entitled to dismissal of the claims against them on qualified immunity grounds. We held that it was not clearly established that the statutes applied to state prisons, and that therefore the individual defendants were entitled to qualified immunity. *See id.* at 1352. While deciding only that the applicability of the ADA and the Rehabilitation Act to state

2. Because Congress has directed that Title II of the ADA be interpreted in a manner consistent with § 504 of the Rehabilitation Act, *see* 42 U.S.C.A. §§ 12134(b), 12201(a) (West 1995), we combine the analysis of the prisoners' ADA and Rehabilitation Act claims, *see Shafer v. Preston Mem'l Hosp.*, 107 F.3d 274, 276 n. 3 (4th Cir. 1997); *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n. 9 (4th Cir.1995); *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 213 n. 1 (4th Cir.1994).

3. The district court also stated that "[p]resumably, the court will at least adhere to the *Torcasio*

holding relating to the issue of qualified immunity, thereby removing any monetary damage claims under the two Acts." (J.A. at 41 n.1.)

4. The prisoners also contend that the district court erred in holding, in accord with *Torcasio*, that Appellees are entitled to qualified immunity from suit for damages under the ADA and the Rehabilitation Act. They argue that unlike the plaintiff in *Torcasio*, they seek statutory damages from MDPSCS and RCI, two state governmental entities to which the defense of qualified immunity is not available. (Appellants' Br. at 32–35.)

prisons was not clearly established at the time of the alleged discrimination, we strongly suggested that the ADA and the Rehabilitation Act do not apply at all to state prisons and prisoners. *See id.* at 1344–52. Because *Torcasio*'s review of the language of the statutes, the relevant constitutional principles, and the manner in which our sister Circuits have addressed the issue was especially thorough, we begin our analysis with a full statement of what we decided in that case.

## A.

Anthony Torcasio, a Virginia state prisoner who alleged that he was disabled because of his "morbid obesity," filed an action against officials of the Virginia Department of Corrections (VDOC), claiming that they had failed reasonably to accommodate his disability in violation of the ADA and the Rehabilitation Act. *See Torcasio,* 57 F.3d at 1342. The individual defendants moved for summary judgment on the ground that they were entitled to qualified immunity. The district court held that the ADA and Rehabilitation Act applied to state prisoners, *see id.* at 1343 (citing *Torcasio v. Murray,* 862 F.Supp. 1482, 1490–91 (E.D.Va.1994)), and then "proceeded to analyze, literally request by request, whether the VDOC officials' responses to Torcasio's requests for accommodation were reasonable," *id.* The district court concluded that the prison officials were entitled to qualified immunity with respect to some of Torcasio's complaints, but were not entitled to qualified immunity with respect to others. The State of Virginia and the individual defendants appealed.

## 1.

On appeal, we began our analysis with the language of the two statutes and noted "that certain portions of both statutes employ language which, when viewed in isolation, appears all-encompassing." *Id.* at 1344. Title II of the ADA prohibits "public entities"

from discriminating against disabled individuals: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132 (West 1995). A "public entity" is broadly defined under the statute to be "*any* State or local government" and "*any* department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C.A. § 12131(1) (West 1995) (emphasis added). Similarly, the Rehabilitation Act prohibits discrimination against disabled individuals "under *any* program or activity receiving Federal financial assistance," 29 U.S.C.A. § 794(a) (West Supp.1997) (emphasis added), and defines "program or activity" to include "*all* of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C.A. § 794(b)(1)(A) (emphasis added).[5]

We recognized the apparent breadth of the statutory language, but stated: "We are not persuaded that this language ... even viewed in isolation from the arguably narrowing text found elsewhere in the acts, brings state prisons 'squarely' within the reach of these acts." *Torcasio,* 57 F.3d at 1344. Accordingly, we stated that we were reluctant to apply the statutes to state prisons and prisoners, "[a]bsent a far clearer expression of congressional intent." *Id.*

Our reluctance to extend the coverage of the statutes to state prisons and prisoners absent a far clearer expression of congressional intent was grounded on the "ordinary rule of statutory construction" that Congress must make its intention to alter the constitutional balance between the States and the Federal Government unmistakably clear in the statute's language:

> program or activity administered by state government, both entities are subject to the Rehabilitation Act. For purposes of this appeal, we assume without deciding that Appellees MDPSCS and RCI receive federal financial assistance.

---

**5.** In the case before us, Appellees filed a motion to dismiss the Rehabilitation Act claims, arguing that RCI receives no federal financial assistance. The district court denied the motion, holding that because the Maryland Department of Corrections receives federal funds, and because RCI is a

[I]f Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); *see also Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).... Congress should make its intention "clear and manifest" if it intends to pre-empt the historic powers of the States, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), or if it intends to impose a condition on the grant of federal moneys, *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981); *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987). "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).

*Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) (internal parallel citations omitted). We observed that pursuant to Supreme Court directives, "where application of a federal statute to a state 'would upset the usual constitutional balance of federal and state powers[,] ... "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" this balance.' " *Torcasio,* 57 F.3d at 1344–45 (alteration in original) (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991) (quoting *Atascadero,* 473 U.S. at 243, 105 S.Ct. at 3147–48)).

In applying this "clear statement" principle, we determined that "[i]t cannot be disputed that the management of state prisons is a core state function." *Id.* at 1345; *see also id.* (citing *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974) (holding that "[o]ne of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task"), *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 1881–82, 104 L.Ed.2d 459 (1989); *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837–38, 36 L.Ed.2d 439 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.")). As support for the proposition that the management of state prisons is a core state function, we cited our decision in *Harker v. State Use Industries,* 990 F.2d 131 (4th Cir.1993), which held that state prisoners involved in an employment skills development program in prison were not entitled to the minimum wage mandated by the Fair Labor Standards Act (FLSA). *See Torcasio,* 57 F.3d at 1345; *see also id.* at 1345 n. 4 (noting that "[m]ost courts have been similarly unwilling to extend the protections of the FLSA to prison inmates" and citing cases). We also quoted a then-recent Fourth Circuit decision (which itself cited Supreme Court precedent) establishing that in the Eighth Amendment context, " 'absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or to substitute their judgment for that of the trained penological authorities charged with the administration of such facilities.' " *Id.* at 1345–46 (quoting *Taylor v. Freeman,* 34 F.3d 266, 268 (4th Cir.1994) (citing *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259–60, 96 L.Ed.2d 64 (1987); *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2394–95, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979); *Procunier,* 416 U.S. at 396, 94 S.Ct. at 1803; *Preiser,* 411 U.S. at 475, 93 S.Ct. at 1829)).

We determined that the unwillingness of federal courts to intrude into the core state function of managing prisons "is in significant measure motivated by the realization

that principles of comity and federalism apply with special force in the context of correctional facilities." *Torcasio,* 57 F.3d at 1346 (citing *Procunier,* 416 U.S. at 405, 94 S.Ct. at 1807 (stating that "where state penal institutions are involved, federal courts have ... reason for deference to the appropriate prison authorities"); *Preiser,* 411 U.S. at 492, 93 S.Ct. at 1837 (holding that the "internal problems of state prisons involve issues [that are] peculiarly within state authority and expertise")).

With these principles in mind, we determined that applying the ADA and the Rehabilitation Act to state prisons would improperly alter the "usual constitutional balance between the States and the Federal Government," *Atascadero,* 473 U.S. at 242, 105 S.Ct. at 3147: "[A]pplication of the ADA and Rehabilitation Act would have serious implications for the management of state prisons, in matters ranging from cell construction and modification, to inmate assignment, to scheduling, to security procedures." *Torcasio,* 57 F.3d at 1346. We thus held that the broad, non-specific language contained in portions of the ADA and the Rehabilitation Act did not make unmistakably clear that the statutes applied to state prisons during the time of Anthony Torcasio's incarceration. We added: "Because the management of state prisons implicates 'decision[s] of the most fundamental sort for a sovereign entity,' Congress must speak unequivocally before we will conclude that it has 'clearly' subjected state prisons to its enactments." *Id.* (alteration in original) (citation omitted) (quoting *Gregory,* 501 U.S. at 460, 111 S.Ct. at 2400–01).

In addition to determining that the definitional sections of the ADA and the Rehabilitation Act relied upon by the plaintiff, namely 42 U.S.C.A. § 12131(1) and 29 U.S.C.A. § 794(b)(1)(A), do not state in unmistakably clear terms that the ADA and the Rehabilitation Act apply to state prisons and prisoners, we also determined that other operative provisions of the statutes "are much less naturally read as including state prisons than are the aforementioned provisions." *Torcasio,* 57 F.3d at 1346. First, we noted that although the ADA's definition of "public entity" is broad, "it is still true that prisons are not expressly mentioned in the statute, and they certainly do not come readily to mind as the type of institution covered." *Id.* at 1346 n. 5. We further asserted that

[e]ven the name ascribed to Title II [of the ADA]—"Public Services"—connotes a ban on discrimination in services provided to the public, not in the prison context where the public is excluded. State prisons thus do not fit neatly within the definition of "public entities" to which the ADA applies.

*Id.* Second, we pointed to 42 U.S.C.A. § 12131(2), in which the ADA defines a "qualified individual with a disability" as a person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities." We held that correctional facilities "do not provide 'services,' 'programs,' or 'activities' as those terms are ordinarily understood." *Torcasio,* 57 F.3d at 1347. We determined that "[t]he terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will." *Id.* We therefore concluded that only a "superficial reading of the statutes" would support a conclusion that state prisons are subject to the requirements of the ADA and the Rehabilitation Act: "The recognition that the terms of the ADA and Rehabilitation Act are illfitting, at best, in the context of correctional facilities, reinforces our conclusion that the applicability of the acts to state prisons is far from clear on the face of the laws." *Id.*

2.

After assessing the statutory language and relevant constitutional principles, we analyzed the manner in which our sister Circuits have addressed the question of whether the ADA and the Rehabilitation Act apply to state prisons. We began by noting that the Ninth Circuit has "squarely held that the Rehabilitation Act applies to prisons." *Id.* at 1349 (citing *Bonner v. Lewis,* 857 F.2d 559 (9th Cir.1988)). We noted, however, that the Ninth Circuit had "retreated" significantly from its holding in *Bonner:*

In *Gates v. Rowland,* 39 F.3d 1439, 1446–47 (9th Cir.1994), the court considered

"how the Act is to be applied in a prison setting," and observed, "[t]he Act was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the Act to apply to prison facilities irrespective of the reasonable requirements of effective prison administration." Thus, the court held that "the applicable standard for the review of the Act's statutory rights in a prison setting [is] equivalent to [the standard for] the review of constitutional rights in a prison setting." *Id.* at 1447.

57 F.3d at 1349 n. 7 (alterations in original). We stated that "we consider *Gates* to be an indication that the Ninth Circuit is beginning to rethink its decision in *Bonner* that state prisons are subject to the requirements of the Rehabilitation Act." *Id.*

We then acknowledged that the Eleventh Circuit, in *Harris v. Thigpen,* 941 F.2d 1495 (11th Cir.1991), expressed its approval of *Bonner. See Torcasio,* 57 F.3d at 1349 (citing *Harris,* 941 F.2d at 1522 n. 41). We also stated, however, that this expression of approval, in addition to being buried in a footnote, was dictum because the issue of whether the Rehabilitation Act applies to state prisons was not before the court. *See id.* at 1349–50 (discussing *Harris* dictum).

Next, we discussed the Tenth Circuit's determination that the Rehabilitation Act "is inapplicable to *federal* prisoners." *See id.* at 1350. We noted that "[i]n *Williams v. Meese,* 926 F.2d 994 (10th Cir.1991), the Tenth Circuit held that a federal prisoner could not invoke [§ 504] of the Rehabilitation Act because 'the Federal Bureau of Prisons does not fit the definition of "programs or activities" governed by [the Rehabilitation Act].'" *Torcasio,* 57 F.3d at 1350 (alteration in original) (quoting *Williams,* 926 F.2d at 997). We understood *Williams* to be a broad ruling that state prisons, like their federal counterparts, "are not subject to the Rehabilitation Act because they do not sponsor 'programs or activities' as those terms

are defined in the Rehabilitation Act." *Id.* We concluded, for purposes of qualified immunity, that the conflict between the Ninth and Tenth Circuits was enough to show that it was not "clearly established" at the time of the alleged discrimination that the ADA and the Rehabilitation Act apply to state prisons. *See id.*

### B.

Subsequent to our decision in *Torcasio,* at least three of our sister Circuits have confronted the issue of whether the ADA and the Rehabilitation Act apply to state prisons. *See White v. Colorado,* 82 F.3d 364 (10th Cir.1996); *Bryant v. Madigan,* 84 F.3d 246 (7th Cir.1996); *Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481 (7th Cir.1997); *Yeskey v. Pennsylvania Dep't of Corrections,* 118 F.3d 168 (3rd Cir.1997).[6] In *White,* 82 F.3d at 364, the Tenth Circuit confirmed the understanding we expressed in *Torcasio* of that Circuit's *Williams* decision. *White* rejected, "[f]or the same reasoning relied upon in *Williams,*" a *state* prisoner's allegation that Colorado prison officials violated the ADA and the Rehabilitation Act by denying him prison employment opportunities because of his disability. *See id.* at 367. *White* therefore held that state prisons do not fit the definition of "programs or activities" governed by the statutes. *Cf. Williams,* 926 F.2d at 997.

In *Bryant v. Madigan,* 84 F.3d 246 (7th Cir.1996), the Seventh Circuit held that the ADA did not provide a cause of action to a disabled state prisoner to challenge the prison's failure to provide guardrails on his bed. Chief Judge Posner, writing for the court, recognized that the ADA contains "no express exclusion" of state prisons, but stated:

It is very far from clear that prisoners should be considered "qualified individual[s]" within the meaning of the Act. Could Congress really have intended disabled prisoners to be mainstreamed into an already highly restricted prison society? Most rights of free Americans, including

---

6. *See also Duffy v. Riveland,* 98 F.3d 447 (9th Cir.1996) (reviewing under *Bonner* and *Gates* inmate's ADA and Rehabilitation Act claims); *Inmates of Allegheny County Jail v. Wecht,* 93 F.3d 1124 (3rd Cir.) (holding that ADA and Rehabilitation Act apply to state prisons), *vacated,* 93 F.3d 1146 (3rd Cir.1996) (granting rehearing en banc).

constitutional rights such as the right to free speech, to the free exercise of religion, and to marry, are curtailed when asserted by prisoners; and there are formidable practical objections to burdening prisons with having to comply with the onerous requirements of the Act, especially when we reflect that alcoholism and other forms of addiction are disabilities within the meaning of the Act and afflict a substantial proportion of the prison population.

*Id.* at 248. Chief Judge Posner stated further that "Judge-made exceptions to laws of general applicability are justified to avoid absurdity." *Id.* at 248–49 (citation omitted). An exception to the ADA for prisoners, he suggested, "though not express, may have textual foundation in the term 'qualified individual.'" *Id.* at 249. Despite strongly suggesting that the ADA does not apply to prisons, the *Bryant* court ultimately left the question open by determining that even if the Act applied, the plaintiff had failed to state a claim. *See id.* at 249 ("Even if there were (as we doubt) *some* domain of applicability of the Act to prisoners, the Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.").

Recently, the Seventh Circuit, in an opinion again authored by Chief Judge Posner, recanted its strong suggestion in *Bryant* that the ADA has no application to prisons. In *Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481 (7th Cir.1997), the court held, despite the reservations it expressed in *Bryant,* that the ADA and the Rehabilitation Act apply to state prisons. *See id.* at 483, 487. In *Crawford,* the plaintiff, a former state prisoner, complained that because of his blindness he had been denied access to educational programs, the library, and the dining hall at the prison where he was incarcerated. Because the district court dismissed the suit on the pleadings, the sole question before the court was whether the ADA and the Rehabilitation Act apply to state prisons. *See id.* at 483.

Beginning with the plain language of the statute, the *Crawford* court conceded that "[i]ncarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access." *Id.* (citing *Bryant,* 84 F.3d at 249). The court conceded further that literal application of the statute to prisons "might seem absurd," *id.* at 486:

Prisoners are not a favored group in society; the propensity of some of them to sue at the drop of a hat is well known; prison systems are strapped for funds; the practical effect of granting disabled prisoners rights of access that might require costly modifications of prison facilities might be the curtailment of educational, recreational, and rehabilitative programs for prisoners, in which event everyone might be worse off.

*Id.* The court conceded still further that "the special conditions of the prison setting license a degree of discrimination that would not be tolerated in a free environment," and admitted that "application [of the ADA] to prisoners might produce some anomalies." *Id.* Nevertheless, the court reversed the course it had taken in *Bryant* and determined that the broad statutory language brought state prisons within the statutes' scope.

The court recognized that statutes are often interpreted in a manner that creates an exception to broad statutory language. *See id.* at 484–85. As an example, the court noted that courts have uniformly excluded prisoners employed in a prison from the minimum-wage and maximum-hours provisions of the Fair Labor Standards Act (FLSA), despite the fact that the "FLSA defines 'employee' sweepingly; prisoners fall within [the statute's] literal scope; and there is no express exception for or applicable to prisoners." *Id.* at 484 (citations omitted). Although acknowledging that "the failure to exclude prisoners from the [ADA] may well ... have been an oversight," *id.* at 487, the court nevertheless stated that "courts do not create exceptions to statutes every time it seems that the legislature overlooked something," *id.* at 484.

Without mentioning our explication in *Torcasio* of the clear statement rule, the *Crawford* court determined that the rule is inapplicable to the question of whether the ADA and the Rehabilitation Act apply to state prisons—despite agreeing that "[p]rison ad-

ministration is indeed a core function of state government." *Id.* at 485. The court held that because the defendant state prison conceded that the ADA applies to its relations with employees and visitors, "the clear-statement rule does not carry this particular core function of state government outside the scope of the Act." *Id.* The court also declined to create an exception "to save the statute from generating absurd consequences." *Id.* at 485.

The *Crawford* court concluded by reinstating the prisoner's suit. The court recognized that on remand, the defendant might be able to show that there was no reasonable accommodation possible, or that any necessary accommodation would impose an undue burden on the prison system. *See id.* at 487. "Terms like 'reasonable' and 'undue' are relative to circumstances," the court opined, "and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized in the parallel setting of prisoners' constitutional rights." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 84–91, 107 S.Ct. 2254, 2259–63, 96 L.Ed.2d 64 (1987)). Thus, the court recognized—like the Ninth Circuit before it, *see Gates*, 39 F.3d at 1446–47—that "security concerns ... are highly relevant to determining the feasibility of the accommodations that disabled prisoners need in order to have access to desired programs and services." *Crawford*, 115 F.3d at 487. The court declined, however, to outline the meaning of "reasonable accommodation" and "undue burden" in the prison context.

Drawing heavily from the Seventh Circuit's *Crawford* opinion, the Third Circuit also recently held that the ADA and the Rehabilitation Act apply to state correctional facilities. *See Yeskey v. Pennsylvania Dep't of Corrections*, 118 F.3d 168 (3rd Cir.1997). In *Yeskey*, the court determined that the statutory language was "all-encompassing" and "broad" and therefore brought state prisons within the scope of the statutes. *See id.* at 170–71. Unlike the Seventh Circuit, the court also relied on regulations promulgated by the Department of Justice (DOJ) "listing correctional facilities ... as covered entities," as confirmation "that the Rehabili-

tation Act and the ADA apply to state and locally-operated [prisons]." *Id.* at 172.

The court recognized that we had questioned in *Torcasio* the applicability of the ADA and the Rehabilitation Act to state prisons, but held that our analysis in that case was "seriously flawed." *Id.* According to *Yeskey*, our "extension of the clear statement rule was unwarranted [because] *Will, Atascadero*, and *Pennhurst* "—cases we cited in *Torcasio* as support for applying the clear statement rule—"all involved instances in which there had been no express waiver or abrogation of the state's traditional immunity from suit." *Id.* In contrast, the court opined, the ADA and the Rehabilitation Act each contain an express abrogation of the Eleventh Amendment immunity of the States. *See id.* at 172–73 · (citing 42 U.S.C.A. § 2000d–7(a)(1) (West 1994) (Rehabilitation Act); 42 U.S.C.A. § 12202 (West 1995) (ADA)).

The court implicitly recognized that the clear statement rule has been applied by the Supreme Court in cases where there was an express abrogation, by Congress of the States' Eleventh Amendment immunity, *see, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (holding that Missouri's mandatory retirement requirement for state judges does not violate the Age Discrimination in Employment Act (ADEA)), and explicitly conceded that whenever " 'Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute,' " *Yeskey*, 118 F.3d at 173 (quoting *Gregory*, 501 U.S. at 460, 111 S.Ct. at 2400–01), and that "prison administration [is] a 'core' state function," *id.* Notwithstanding these concessions, the court determined that the clear statement rule was inapplicable because, it concluded, Congress made clear in the language of the statutes that the ADA and the Rehabilitation Act apply to state prisons. *See id.*

The court acknowledged the looming "specter of federal court management of state prisons," resulting from application of the ADA and the Rehabilitation Act. *Id.* at 174; *see also id.* ( " '[I]f the ADA applies to

routine prison decisions, it is not unfathomable that courts will be used to reconstruct cells and prison space, to alter scheduling of inmate movements and assignments, and to interfere with security procedures.'" (quoting Appellees' Br. at 15)). The court held, however, that such concerns "do not override our conclusion that the ADA applies to prisons." *Id.* The court concluded: "[O]ur holding does not dispose of the controversial and difficult question [of] whether principles of deference to the decisions of prison officials in the context of constitutional law apply to statutory rights. We are not sure of the answer, and need not address that question now." *Id.* at 174–75 (citation and footnote omitted) (citing *Turner v. Safley*, 482 U.S. at 78, 107 S.Ct. at 2255–56). Thus, the court— like the Seventh Circuit in *Crawford*—declined to outline the meaning of "reasonable accommodation" and "undue burden" under the ADA and the Rehabilitation Act in the prison context.

We remain firmly convinced that *Torcasio*'s explication of the clear statement principle and its application to the issue before us is both thorough and persuasive. *Torcasio* accurately outlined the parameters of the clear statement rule, stating that Congress must speak clearly in the statutory text when it intends to alter the traditional balance between the states and the federal government. *See* 57 F.3d at 1346. *Torcasio* also forcefully explained why the operation of state prisons is an area traditionally reserved to the states, and persuasively outlined the sundry ambiguities in the statutory text which reveal that Congress failed to speak with unmistakable clarity on the issue of whether the Rehabilitation Act and the ADA apply to state prisons. Most importantly, *Torcasio* recognized the profound consequences that would result if the statutes were applied to state prisons: "[A]pplication of the ADA and Rehabilitation Act would have serious implications for the management of state prisons, in matters ranging from cell construction and modification, to inmate assignment, to scheduling, to security problems." 57 F.3d at 1346.

Our conclusion today that *Torcasio* was rightly decided, and that the Rehabilitation Act and the ADA do not apply to state prisons, is fortified by the interpretive analyses undertaken by the Ninth, Seventh, and Third Circuits in determining that the statutes have application in the state prison context, by the extraordinary lengths to which those circuits have gone to acknowledge the chaos that will likely result from their holdings, and, in some cases, by the efforts they have made to limit the reach of their holdings. Most importantly, each of the Circuits holding that the Rehabilitation Act and the ADA apply to state prisons has gone to extraordinary lengths to acknowledge the chaos likely to result from their holdings. *See, e.g., Crawford,* 115 F.3d at 487 (noting "security concerns"); *Yeskey,* 118 F.3d at 174 (acknowledging the "specter of federal court management of state prisons," and that "it is not unfathomable that courts will be used to reconstruct cells and prison space, to alter scheduling of inmate movements and assignments, and to interfere with security procedures" (quotation omitted)). In addition, the Ninth Circuit has gone out of its way to limit the reach of its holding that the statutes apply to state prisons. Specifically, while purporting to adhere to the text of the Rehabilitation Act and the ADA in determining that the statutes apply to state prisons, the Ninth Circuit—when forced to outline the meaning of "reasonable accommodation" and "undue burden" in the state prison context— has created extratextually, out of whole cloth, a statutory standard by engrafting the constitutional standard onto the statute, *see Gates,* 39 F.3d at 1447; for their part, the Seventh and Third Circuits have transformed themselves into contortionists attempting to avoid the necessary consequences of their holdings by declining to outline the meaning of "reasonable accommodation" and "undue burden" in the prison context, *see Crawford,* 115 F.3d at 487; *Yeskey,* 118 F.3d at 174–75. Unlike the Ninth, Seventh, and Third Circuits, we decline to engage in such interpretive gymnastics.

Accordingly, we hereby reaffirm that state prisons cannot be subjected to the ADA and the Rehabilitation Act unless there has been a clear and plain statement from Congress permitting federal intrusion into this area of historic state control. Furthermore, we con-

clude, as we strongly suggested in *Torcasio*, that Congress has made no such clear statement regarding the application of the ADA and the Rehabilitation Act to state prisons. Therefore, we hold that state prisons are not subject to the ADA and the Rehabilitation Act.

### C.

Not surprisingly, the prisoners and the Justice Department contend that *Torcasio* was wrongly decided. (Appellants' Br. at 23–25; DOJ Br. at 12–21.) First, they argue that courts are to apply the clear statement rule only where statutory intent is ambiguous, *see Gregory*, 501 U.S. at 470, 111 S.Ct. at 2406, and that in this case "there is no ambiguity as to the statute's [sic] coverage of state prisons and prisoners." (Appellants' Br. at 25; *accord* DOJ Br. at 17.) According to the prisoners and the Justice Department, the *Torcasio* court's determination that it is "far from clear on the face of the laws" that Congress intended the statutes to apply to state prisons, *see* 57 F.3d at 1347, was simply erroneous. (Appellants' Br. at 23; DOJ Br. at 19.)

Relying on the broad, non-specific language of the statutes, the prisoners and the Justice Department argue that "the operations of state or local correctional facilities fall quite naturally within the terms 'programs' and 'activities.'" (DOJ Br. at 19; *accord* Appellants' Br. at 23.) We cannot agree. "[I]ncarceration, which requires the provision of a place to sleep, is not a 'program' or 'activity.'" *Bryant*, 84 F.3d at 249; *accord White*, 82 F.3d at 367 (holding that prisons do not sponsor "programs" or "activities" as those terms are ordinarily understood (adopting *Williams*, 926 F.2d at 997)); *Torcasio*, 57 F.3d at 1347 (same). The operations of state prisons fall naturally within the statutory terms "services," "programs," and "activities" only when particular services, activities, or programs are divorced from the context of correctional facilities. A family outing to the local public library, for example, falls quite naturally within the common understanding of the meaning of "activity," *see Crawford*, 115 F.3d at 483. The use of a court-mandated prison law library by an indi-

vidual incarcerated by a state, *see Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (requiring prison authorities to provide prisoners with adequate law libraries), on the other hand, does not fall naturally within the ambit of that statutory term. As we stated in *Torcasio*, "most prison officials would be surprised to learn that they were" required by the ADA and the Rehabilitation Act to provide "'services,' 'programs,' or 'activities' as those terms are ordinarily understood." 57 F.3d at 1347.

We also concluded in *Torcasio* that "[t]he terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will." *Id.* The prisoners and the Justice Department contend that our suggestion that the ADA and the Rehabilitation Act are inapplicable to programs and services that are obligatory in nature was incorrect because "the terms 'eligible' and 'participate' do not, as *Torcasio* stated,'imply voluntariness' or mandate that an individual seek out or request a service to be covered." (DOJ Br. at 20 (citation omitted) (quoting *Torcasio*, 57 F.3d at 1347); *accord* Appellants' Br. at 23–24.) The provision by a state government of some compulsory programs and services may be subject to the requirements of the ADA and the Rehabilitation Act, notwithstanding the fact that such programs or services are in some sense "involuntary." Nevertheless, we are satisfied that our conclusion in *Torcasio* was correct: The statutory language does not bring to mind prisoners being held against their will, and therefore neither the ADA nor the Rehabilitation Act state with unmistakable clarity that the statutes apply to state prisons. *See* 57 F.3d at 1346–47.

Furthermore, the introductory language of both statutes reveals that Congress did not clearly express an intention to make the statutes applicable to state prisons and prisoners. Under the ADA, Congress determined that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C.A.

§ 12101(a)(8) (West 1995). Achieving these goals, Congress found, would provide "people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our *free society* is justifiably famous." 42 U.S.C.A. § 12101(a)(9) (emphasis added). This introductory language in no way evinces an intention by Congress to make the ADA applicable to state prisons. As Appellees put it, "[w]ithout question, a prison is hardly such a free society." (Appellees' Br. at 28.)

Similarly, the Rehabilitation Act's introductory language does not manifest an intention by Congress to make the Rehabilitation Act applicable to state prisons. The introductory section of the Rehabilitation Act states:

(3) disability is a natural part of the human experience and in no way diminishes the right of individuals to—

(A) live independently;

(B) enjoy self-determination;

(C) make choices;

(D) contribute to society;

(E) pursue meaningful careers; and

(F) enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society.

29 U.S.C.A. § 701(a)(3) (West Supp.1997). This introductory language, like that of the ADA, does not even hint at an intention by Congress to make the ADA applicable to state prisons. Indeed, the contrary inference—that Congress never contemplated that the Rehabilitation Act would apply to state prisons—is readily drawn. Disabled and nondisabled prisoners alike, because of their inability to live in a free society, neither "live independently," "enjoy self-determination," nor "enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society." *Cf. Crawford,* 115 F.3d at 486 (conceding that "[i]nsofar as the Act

is intended to 'mainstream' disabled people, its application to prisoners might produce some anomalies" (citation omitted)).

Congress simply has not spoken through the ADA or the Rehabilitation Act with anywhere near the clarity and the degree of specificity required for us ·to conclude that state prisons are subject to the statutes. Neither the prisoners nor the Department of Justice are able to direct us to statutory language or legislative history to the contrary. Indeed, the legislative history of both the ADA and the Rehabilitation Act is silent on the applicability of the statutes to state prisons.[7] In *Yeskey,* 118 F.3d 168, the Third Circuit determined that this congressional silence constituted tacit approval of its conclusion that the ADA and the Rehabilitation Act "apply to state and local correctional facilities." *Id.* at 174. The court stated:

[T]he legislative history does not inveigh against this conclusion. When the ADA was enacted in 1990, the Rehabilitation Act had been law for seventeen years and a number of cases had held it applicable to prisons and prisoners, yet Congress did not amend that Act or alter any language so as to extirpate those interpretations.

*Id.* at 174 n. 7; *accord Crawford,* 115 F.3d at 484 (noting that "[w]hen the [ADA] was passed in 1990, the Rehabilitation Act ... had been on the books for 17 years, and there were several cases holding that Act applicable to prisons and prisoners" (citing *Bonner v. Lewis,* 857 F.2d 559 (9th Cir.1988); *Harris v. Thigpen,* 727 F.Supp. 1564, 1582–83 (M.D.Ala.1990), *aff'd,* 941 F.2d 1495 (11th Cir.1991); *Sites v. McKenzie,* 423 F.Supp. 1190, 1197 (N.D.W.Va.1976))). Congressional silence in the ADA's legislative history regarding the applicability of the statute to state prisons, however, provides no basis for inferring congressional approval of one Circuit's (and two district courts') interpretation of the Act. Indeed, "[i]t is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law." *Gir-*

---

7. The dissent considers our statement that the legislative history of the statutes is silent on the applicability of the statutes to state prisons to be a concession "that the legislative histories of the Rehabilitation Act and the ADA *do not forbid* application [of the statutes] to state prisons."

*Post* at 614 (emphasis added). To the contrary, congressional silence over whether the Rehabilitation Act and the ADA apply to state prisons buttresses our conclusion that Congress has failed to state with unmistakable clarity that the statutes apply in the state prison context.

ouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946); see also EEOC v. Gilbarco, Inc., 615 F.2d 985, 1013–15 (4th Cir.1980) (Murnaghan, J., concurring in part and dissenting in part) (questioning soundness of proposition that congressional silence or inaction in reenacting a statute constitutes approval of prior judicial interpretation of the statute). As the *Crawford* court acknowledged, "Congress may not have been aware of the cases interpreting that Act." *Crawford,* 115 F.3d at 484. Accordingly, we can conclude only that Congress did not contemplate, let alone approve, the pre-ADA application of the Rehabilitation Act to state prisons and the implications such application would have for the sovereignty of the States. *Cf. Virginia Dep't of Education v. Riley,* 106 F.3d 559, 567 (4th Cir.1997) (en banc) (applying clear statement rule and stating that not "a single word from the statute or from the legislative history of [the Individuals with Disabilities Education Act (IDEA) ] evidence[s] that Congress even considered" requiring states to continue providing educational services to disabled children after their expulsion for misconduct unrelated to their disabilities).[8]

Appellees do not argue that had Congress expressed with unmistakable clarity an intention to regulate state correctional facilities through the ADA and the Rehabilitation Act, it would nonetheless have been without the authority to do so. Presumably, Appellees decline to make such an argument in light of *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 547–56, 105 S.Ct. 1005, 1015–20, 83 L.Ed.2d 1016 (1985) (leaving primarily to political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers). Were we operating pre-*Garcia,* however, Congress' authority to regulate state prisons in the manner contended by the prisoners and the Justice Department would be doubtful. *See National League of Cities v. Usery,* 426 U.S. 833, 855, 96 S.Ct. 2465, 2476, 49 L.Ed.2d 245 (1976) ("Congress may not exercise [Commerce Clause] power so as to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made."), *overruled by Garcia,* 469 U.S. at 528, 105 S.Ct. at 1006. *Garcia* notwithstanding, whether Congress even has the authority to regulate state prisons is not readily apparent. *See Garcia,* 469 U.S. at 580, 105 S.Ct. at 1032–33 (Rehnquist, J., dissenting) (stating that principle outlined in *National League of Cities* "will, I am confident, in time again command the support of a majority of this Court"); *see also Gregory,* 501 U.S. at 464, 111 S.Ct. at 2402–03 (noting *Garcia*'s constraint on "our ability to consider the limits that the state-federal balance places on Congress' powers under the Commerce Clause," and stating that "[a]pplication of the plain statement rule thus may avoid a potential constitutional problem"). This is true even though Congress, in addition to relying on its Commerce Clause powers, invoked its authority to enforce the Fourteenth Amendment when it enacted the ADA, *see* 42 U.S.C.A. § 12101(b)(4) (West 1995). Congress' enforcement power under the Fourteenth Amendment is not unlimited. *See City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2159, 138 L.Ed.2d 624 (1997) (holding that the Religious Freedom Restoration Act (RFRA) is "a considerable congressional intrusion into the States' traditional prerogatives," and that Congress exceeded its power under the Fourteenth Amendment in enacting the statute); *Gregory,* 501 U.S. at

---

8. The dissent suggests that our reliance on *Virginia Dep't of Education v. Riley,* 106 F.3d 559 (4th Cir.1997) (en banc), is questionable because subsequent to our decision in that case, Congress amended the Individuals With Disabilities Education Act (IDEA) to ensure, contrary to our holding in *Riley,* that states provide educational services to disabled children expelled from school for misconduct unrelated to their disabilities. *See post* at 614 n.*. Congress' subsequent amendment, however, in no way undermines the reasoning of *Riley,* nor does it render our reliance on *Riley* "questionable." In *Riley,* we held

that § 1412 of the IDEA, *see* 20 U.S.C.A. § 1412 (West Supp.1997), was ambiguous, applied the clear statement rule, and held that absent a clearer statement from Congress, the federal government could not require states to provide educational services to disabled students expelled for misconduct wholly unrelated to their disabilities. *See Riley,* 106 F.3d at 561. Contrary to the dissent's suggestion, Congress' subsequent "clarification" of the IDEA only validates our conclusion in *Riley* that the statutory language was ambiguous, and that therefore the clear statement rule should be applied.

469, 111 S.Ct. at 2405 ("[T]he Fourteenth Amendment does not override all principles of federalism."); *but cf. Clark v. California*, 123 F.3d 1267, 1270 (9th Cir.1997) (holding that "both the ADA and the Rehabilitation Act were validly enacted under the Fourteenth Amendment"); *Crawford*, 115 F.3d at 487 (holding "that the ADA is [within] the scope of section 5" of the Fourteenth Amendment).

Second, in addition to arguing that the clear statement rule should not apply because the statutes are unambiguous, the prisoners contend that the clear statement rule may be applied only where "the proposed application of federal law would infringe upon a core function going to the 'heart of representative government,' *e.g.*, 'the authority of the people of the States to determine the qualifications of their most important government officials.'" (Appellants' Br. at 24 (quoting *Gregory*, 501 U.S. at 463, 111 S.Ct. at 2402).) Put differently, the prisoners contend that Congress is required to make a clear statement of its intention to alter the usual constitutional balance between the States and the Federal Government *only* when federal legislation implicates the functioning of democratic processes within a state. The Supreme Court, however, has not confined the clear statement rule so narrowly. *See, e.g., Will*, 491 U.S. at 65, 109 S.Ct. at 2309 (describing the clear statement rule as an "ordinary rule of statutory construction" to be applied in analyzing statutes altering the "usual constitutional balance between the States and the Federal Government"). Indeed, the Supreme Court has held that the clear statement rule is to be invoked "[i]n traditionally sensitive areas, such as legislation affecting the federal balance." *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). As we have stated, the management of state prisons is just such a traditionally sensitive area, and application of the ADA and the Rehabilitation Act to state prisons would unquestionably affect the federal balance. *See*

*Torcasio*, 57 F.3d at 1345 (citing *Procunier*, 416 U.S. at 412, 94 S.Ct. at 1810–11; *Preiser*, 411 U.S. at 491–92, 93 S.Ct. at 1837–38); *cf. Riley*, 106 F.3d at 566 (holding that "[i]nsistence upon a clear, unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner is especially important where ... the claimed condition requires the surrender of one of ... the powers or functions reserved to the States by the Tenth Amendment").

The Justice Department argues that the "extension of the clear statement rule [in *Torcasio* ] was unwarranted ... [because] both Section 504 and Title II of the ADA contain an unequivocal expression of Congressional intent to overturn the constitutionally guaranteed immunity of the several states." (DOJ Br. at 16 (quotation omitted) (citing 42 U.S.C.A. § 2000d–7(a)(1) (West 1994); 42 U.S.C.A. § 12202 (West 1995))); *accord Yeskey*, 118 F.3d at 172–73. We agree that Congress' express abrogation in the ADA and the Rehabilitation Act of the Eleventh Amendment immunity of the States suggests that Congress intended for those statutes to apply to states generally.[9] However, "a clear statement is required not simply in determining whether a statute applies to the States, but also in determining whether the statute applies in the particular manner claimed." *Riley*, 106 F.3d at 568 (citing *Gregory*, 501 U.S. at 460–70, 111 S.Ct. at 2400–06).

*Gregory* is closely analogous. *See* 501 U.S. at 452, 111 S.Ct. at 2396–97. In *Gregory*, the Supreme Court held that the Age Discrimination in Employment Act (ADEA), a statute in which Congress expressly abrogated the States' Eleventh Amendment immunity, *see* 29 U.S.C.A. § 630(b)(2) (West 1985), did not apply to state judges because the statute did not unambiguously reveal that Congress intended such a result. Like the ADEA, the ADA and the Rehabilitation Act are statutes in which Congress has expressly abrogated the Eleventh Amendment immunity of the

---

**9.** Although Congress is without the authority to abrogate the Eleventh Amendment immunity of the States pursuant to its Commerce power, it may abrogate the Eleventh Amendment immunity of the States pursuant to its enforcement power under § 5 of the Fourteenth Amendment. *See Seminole Tribe of Florida v. Florida*, —— U.S. ——, ——, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976).

States. *See* 42 U.S.C.A. § 2000d–7(a)(1); 42 U.S.C.A. § 12202. This express abrogation suggests that Congress intended the statutes to apply to states generally. The applicability of the statutes to state prisons and prisoners, however, like the applicability of the ADEA to state judges, was simply not addressed by Congress in the language of the statutes. Thus, in *Gregory* the Supreme Court determined that it was ambiguous whether Congress intended the ADEA to apply to state judges. *See Gregory,* 501 U.S. at 467, 111 S.Ct. at 2404. The language of the statute, the court held, "is sufficiently broad that we cannot conclude that the statute plainly covers appointed state judges." *Id.* Here, for the same reasons, because the statutory language is so broad, we cannot conclude that Congress intended that the statutes apply to state prisons and prisoners. As in *Gregory,* the breadth of the statutory language renders it ambiguous. We therefore decline to attribute to Congress an intent to intrude on a core state function in the face of statutory ambiguity. *Cf. Gregory,* 501 U.S. at 464–71, 111 S.Ct. at 2402–07; *see also Torcasio,* 57 F.3d at 1346.[10]

In *Gregory,* the Supreme Court determined that it could not "conclude that the statute plainly covers appointed state judges," 501 U.S. at 467, 111 S.Ct. at 2404, because of the solicitude owed to the rights of the States in our federalist system. The court stated:

> [I]nasmuch as this Court in *Garcia* has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise. "[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests."

*Id.* at 464, 111 S.Ct. at 2403 (quoting Laurence H. Tribe, *American Constitutional Law* § 6–25, at 480 (2nd ed.1988)). The court went on to hold that Congress also must speak with unmistakable clarity when enacting intrusive legislation pursuant to its power under § 5 of the Fourteenth Amendment. *See id.* at 467–70, 111 S.Ct. at 2404–06. The court stated that " '[b]ecause such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment.' " *Id.* at 469, 111 S.Ct. at 2405–06 (quoting *Pennhurst,* 451 U.S. at 16, 101 S.Ct. at 1539). The case before us is indistinguishable from *Gregory.* Just as "it is at least ambiguous whether Congress intended that appointed judges ... be included" within the scope of the ADEA, *id.* at 470, 111 S.Ct. at 2406, it is *at least* ambiguous whether Congress intended that the strictures of the ADA and the Rehabilitation Act apply to state prisons. Accordingly, as in *Gregory,* "[i]n the face of such ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions regardless of whether Congress acted pursuant to its Commerce Clause powers or § 5 of the Fourteenth Amendment." *Id.*

■ Finally, both the prisoners and the Department of Justice contend that "even if this Court were to adhere to the view that it is ambiguous on the face of the statutes whether they apply to state prisons, any such ambiguity is definitively resolved by DOJ regulations." (Appellants' Br. at 26; *accord* DOJ Br. at 8–12.) They argue that DOJ regulations applying the statutes to state prisons must be accorded "the greatest possible weight and deference in interpreting the statutes." (Appellants' Br. at 21; *accord*

---

**10.** The dissent claims that our holding today means that "Congress cannot make the Rehabilitation Act and the ADA applicable to state prisons or to other areas traditionally reserved to the states unless it separately lists each state agency that the statute apply to in statutory text." *Post* at 614. Citing *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), the dissent contends that "[t]he Supreme Court ...

has expressly rejected such a requirement." *Post* at 614. We do not hold, however, that Congress must list each state agency to which statutes apply to make the statutes applicable to specific state agencies. We hold only, as the Supreme Court did in *Gregory,* that Congress did not clearly express in either the Rehabilitation Act or the ADA an intention to intrude on the core state function of managing state prisons.

DOJ Br. at 8 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)).) The regulations promulgated under § 504 of the Rehabilitation Act define "program" to mean "the operations of the agency or organizational unit of government receiving or substantially benefiting from the Federal assistance awarded, *e.g.,* a police department or department of corrections." 28 C.F.R. § 42.540(h) (1996). The regulations promulgated under Title II of the ADA designate the Department of Justice as the agency responsible for coordinating the compliance activities of public entities that administer "programs, services, and regulatory activities relating to law enforcement, public safety, and the administration of justice, including courts and correctional institutions." 28 C.F.R. § 35.190(b)(6) (1996). The preamble to the ADA regulations also states that "[a] public entity is not ... required to provide attendant care, or assistance in toileting, eating, or dressing to individuals with disabilities, except ... where the individual is an inmate of a custodial or correctional institution." 28 C.F.R. pt. 35, app. A, at 468 (1996).

The regulations promulgated under the Rehabilitation Act adopt the Uniform Federal Accessibility Standards (UFAS), which apply to federal agencies and entities receiving federal financial assistance. *See* 28 C.F.R. § 42.522(b) (1996). UFAS lists jails, prisons, reformatories, and "[o]ther detention or correctional facilities" as institutions to which UFAS standards apply. *See* 41 C.F.R. subpt. 101–19.6, app. A, at 150 (1996). UFAS standards regulate in minute detail the construction and maintenance of buildings of federal agencies and institutions receiving federal funding. UFAS standards consume 87 pages in the Code of Federal Regulations, *see* 41 C.F.R. subpt. 101–19.6, app. A, at 140–227, and include requirements for, *inter alia,* the construction, modification, or installation of ground and floor surfaces, parking and passenger loading zones, curb ramps, ramps, stairs, elevators, platform lifts, windows, doors, entrances, drinking fountains and water coolers, water closets, toilet stalls, urinals, lavatories and mirrors, bathtubs, shower stalls, toilet rooms, sinks, handrails, grab bars, tub and shower seats, alarms, telephones, assembly areas, and dwelling units, *see id.*

The regulations promulgated under the ADA permit covered entities building new or altering existing facilities to follow either UFAS or the ADA Accessibility Guidelines for Buildings and Facilities (ADAAG). *See* 28 C.F.R. § 35.151(c) (1996). Amendments to the ADAAG, adopted as an Interim Final Rule, effective December 20, 1994, by the Architectural & Transportation Barriers Compliance Board, include specific accessibility guidelines for "detention and correctional facilities." 59 Fed.Reg. 31,676, 31,770–72 (1994); *see also* 36 C.F.R. pt. 1191, app. A, at 782–84 (1996). The Department of Justice has proposed adoption of the interim final rule. *See* 59 Fed.Reg. at 31,808. Like the byzantine UFAS standards, ADAAG standards intricately regulate the construction or modification of existing covered facilities and consume 129 pages of the Code of Federal Regulations. *See* 36 C.F.R. pt. 1191, app. A, at 663–792. ADAAG requirements specific to "detention and correctional facilities" address, *inter alia,* specifications for prison visiting areas, medical care facilities, and restrooms; the "dispersion" of "accessible cells" within the correctional facility; accommodations for inmates with hearing impairments; and the appropriate height of prison beds. *See id.* at 782–84.

The prisoners and the Justice Department contend that in the event of ambiguity over whether the statutes apply to state prisons we must defer to the Justice Department's interpretation of the statutes as set forth in the regulations. They make this contention "as if we were interpreting a statute which has no implications for the balance of power between the Federal Government and the States." *Riley,* 106 F.3d at 567. The implications for the balance of power between the Federal Government and the States, however, are enormous. The intrusiveness of regulations (especially the UFAS and ADAAG standards) makes this apparent. Where application of an ambiguous federal statute would "upset the usual constitutional balance of federal and state powers," *Gregory,* 501 U.S. at 460, 111 S.Ct. at 2401, as in this case,

we will not defer to an administrative agency's interpretation of the statute, however reasonable, *see Riley*, 106 F.3d at 567. The argument to the contrary, put forth by both the prisoners and the Department of Justice, has been soundly rejected by the Supreme Court. *See Gregory*, 501 U.S. at 493, 111 S.Ct. at 2418 (Blackmun, J., dissenting) (arguing unsuccessfully that *Chevron* deference, rather than clear statement rule, was appropriate).

Finally, if nothing else convinced us that the ADA and the Rehabilitation Act do not apply to state prisons, the Ninth Circuit's decision in *Gates* would. *See* 39 F.3d at 1439. Bound by a previous decision holding that the Rehabilitation Act applies to state prisons, *see Bonner*, 857 F.2d at 559, the *Gates* court was forced to consider "how the Act is to be applied in a prison setting." *Gates*, 39 F.3d at 1446; *but cf. Yeskey*, 118 F.3d at 174–75 & n. 8 (applying ADA and Rehabilitation Act to state prisons but declining to determine appropriate standard for reviewing claims brought under the statutes); *Crawford*, 115 F.3d at 483, 487 (same). Recognizing that "[t]he Act was not designed to deal specifically with the prison environment," and that "[t]here is no indication that Congress intended the Act to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration," the court determined that "[i]t is highly doubtful that Congress intended a more stringent application of the prisoners' statutory rights created by the Act than it would the prisoners' constitutional rights." *Gates*, 39 F.3d at 1446–47. Thus, the court deemed—out of whole cloth—"the applicable standard for the review of the Act's statutory rights in a prison setting to be equivalent to the review of constitutional rights in a prison setting." *Id.* at 1447 (citing *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).[11] As a result, although the Ninth Circuit has applied the Rehabilitation Act

(and the ADA, *see Duffy*, 98 F.3d at 447) to state prisons, it has effectively eviscerated the statutes in the prison context. *See* Ira P. Robbins, *George Bush's America Meets Dante's Inferno: The Americans with Disabilities Act in Prison*, 15 Yale L. & Pol'y Rev. 49, 96 & n.249 (1996) (citing William C. Collins, *Use of* Turner *Test Deferring to Institutions' Security Concerns May Sharply Limit Inmates' ADA Protection*, Correctional L. Rep. at 65 (Feb.1995)); *see also Bullock v. Gomez*, 929 F.Supp. 1299, 1306–08 (C.D.Cal.1996) (analyzing inmate's ADA and Rehabilitation Act claims under *Turner* standard).

The Ninth Circuit's decision in *Gates* reveals the futility of applying the statutes in the prison context. *Gates* makes clear that Congress did not contemplate that the statutory requirement that "reasonable accommodation" be made for disabled individuals (unless doing so would impose an "undue burden") would apply to state correctional facilities. *See Gates*, 39 F.3d at 1446–47. *Gates* also makes clear that application of the statutory mandate (not to mention compliance with the onerous regulations) is, in fact, unworkable in the prison context. *See id.* For these reasons, *Gates* convinces us of the correctness of our determination that the ADA and the Rehabilitation Act do not apply to state prisons. Because the statutes do not apply to state prisons and prisoners, we affirm the district court's grant of summary judgment for Appellees on the prisoners' ADA and Rehabilitation Act claims.[12]

### III.

After the district court granted summary judgment for Appellees on the prisoners' ADA and Rehabilitation Act claims, a hearing was held on Appellees' motion for summary judgment on the Eighth Amendment claims of prisoners Amos, William Smith,

---

**11.** Although purporting in *Bonner* to adhere to the statutory text in determining that the Rehabilitation Act applies to state prisons, *see Bonner v. Lewis*, 857 F.2d 559, 562 (9th Cir.1988), the Ninth Circuit's determination in *Gates* that the constitutional standard applies to Rehabilitation Act claims was entirely extratextual, *see Gates v. Rowland*, 39 F.3d 1439, 1447 (9th Cir.1994).

**12.** Given our holding that the ADA and the Rehabilitation Act do not apply to state prisons and prisoners, we need not address the prisoners' claim that the district court erred in holding that Appellees are entitled to qualified immunity from suit for damages under the statutes.

Michael Smith, Megginson, Ralph, and Prymerman, brought under 42 U.S.C.A. § 1983 (West Supp.1997). At the close of the hearing, the district court ordered that the prisoners' constitutional claims be dismissed. Thereafter, the court issued an amended final order granting Appellees' motion for summary judgment "as to all claims." (J.A. at 136.)

The six prisoners contend that the district court erred in granting summary judgment on their Eighth Amendment claims. They argue that they presented evidence of inadequate medical care sufficient to withstand summary judgment. According to the prisoners, the evidence viewed in the light most favorable to them establishes that Appellees Lanham, the Commissioner of the Maryland Division of· Corrections, and Galley, the Warden of RCI, knew about but failed to take appropriate measures to remedy serious risks to their health.

We review a district court's grant of summary judgment de novo. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988). Summary judgment is proper only if no genuine issue of material fact is in dispute. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact is in dispute, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### A.

▮ The prisoners sued MDPSCS; RCI; Lanham, in his official capacity as the Commissioner of the Maryland Division of Corrections; and Galley, in his official capacity as the Warden of RCI. Lanham and Galley contend that

the only Appellees in this case are two state institutions and two individuals in their official capacity, See Amended Complaint caption. J.A. 29. These Appellees are immune from any suit for monetary damages under § 1983. See Will v. Michigan Department of State Police, 491 U.S.

58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). For this reason alone, defendants are entitled to summary judgment on the Eighth Amendment claims.

(Appellees' Br. at 44; see also DOJ Br. at 13 (noting that "the plaintiffs in this case have not sued any of the defendants in their individual capacities").) The prisoners concede that they "failed to specify in their Complaint for damages that the defendants were named 'in their individual capacities,' " but argue that "the court should look to the totality of the Complaint as well as the course of proceedings to determine whether the defendants received sufficient notice of potential exposure to liability." (Appellants' Br. at 45 n.39.)

In Biggs v. Meadows, 66 F.3d 56 (4th Cir.1995), we held "that a plaintiff need not plead expressly the capacity in which he is suing a defendant in order to state a cause of action under § 1983." Id. at 60. Accordingly, we reversed the district court's dismissal of a § 1983 complaint brought by a pro se prisoner who "had failed to plead expressly that the defendants were being sued as individuals." Id. at 58. Although the prisoners in this case never cite Biggs, they apparently argue that we should apply the Biggs rule.

In Biggs, we noted that the Supreme Court has "declined to resolve[ ] a split among the federal circuit courts on the appropriate way to treat a complaint that fails to state explicitly the capacity in which a defendant is sued under § 1983." Biggs, 66 F.3d at 59 (citing Hafer v. Melo, 502 U.S. 21, 23, 112 S.Ct. 358, 360–61, 116 L.Ed.2d 301 (1991)). We determined, however, that "a substantial majority" of the Circuits look "to the substance of the plaintiff's claim, the relief sought, and the course of proceedings to determine the nature of a § 1983 suit when a plaintiff fails to allege capacity." Id. Because we found this view to be persuasive, see id. at 60, we adopted it. We stated: "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." Id. at 61.

The *Biggs* rule does not apply to the case before us. By the rule's own terms, it applies only "when a plaintiff does not allege capacity specifically." *Id.; see also id.* at 59 (noting that "when a plaintiff fails to allege capacity," the majority of Circuits look to the substance of the complaint). Unlike the prisoner in *Biggs*, whose complaint was silent on the issue of the defendants' capacity, the prisoners here alleged capacity specifically by expressly pleading that Lanham and Galley were being sued in their official capacities. Indeed, they concede as much in their briefing on appeal. Furthermore, unlike the prisoner in *Biggs*, the prisoners in the instant case are not proceeding pro se. Thus, the Supreme Court's directive that we construe pro se complaints liberally, *see Boag v. Mac-Dougall*, 454 U.S. 364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551 (1982) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), is inapposite. The prisoners in this case have been represented from the outset of this litigation by several public interest law firms, including the American Civil Liberties Union of Maryland (ACLU), an organization known for its litigation prowess. The relaxed pleading requirements applicable to pro se complaints, therefore, are simply not applicable here. *See, e.g., White v. White*, 886 F.2d 721, 722–23 (4th Cir.1989) (holding that pro se complaints, however inartfully pleaded, must be held to "less stringent standards than pleadings drafted by attorneys"); *Boyce v. Alizaduh*, 595 F.2d 948, 951 (4th Cir.1979) (same). Accordingly, as is revealed on the face of the complaint, the prisoners brought suit against Lanham and Galley in their official capacities only. As such, Lanham and Galley, like MDPSCS and RCI, are immune from suit for monetary damages under § 1983. *See Will*, 491 U.S. at 71, 109 S.Ct. at 2312 (holding that "a suit against a state official in his or her official capacity ... is no different from a suit against the State itself"

which is barred by the Eleventh Amendment); *see also Biggs*, 66 F.3d at 60. The district court therefore properly granted Appellees' motion for summary judgment on the prisoners' constitutional claims.

### B.

To the extent the prisoners seek injunctive relief against Appellees under § 1983,[13] the district court properly granted summary judgment. No reasonable jury could conclude that Lanham and Galley violated the prisoners' constitutional rights under the Eighth Amendment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (holding that summary judgment is appropriate "if the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party"). The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.[14] To establish the imposition of cruel and unusual punishment, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious"; and (2) that subjectively the prison officials acted with a sufficiently culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991) (holding that Eighth Amendment claims turn on an "objective component ... (Was the deprivation sufficiently serious?), and[a] ... subjective component (Did the officials act with a sufficiently culpable state of mind?)"); *see also Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir.1995); *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993).

In the context of an Eighth Amendment claim based on a deprivation of medical attention, the objective component "is satisfied only if the medical need of the prisoner is 'serious.'" *Shakka*, 71 F.3d at 166 (quoting

13. State officials sued in their official capacities for injunctive relief are persons (and therefore amenable to suit) "under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2312 n. 10, 105 L.Ed.2d 45 (1989) (quoting *Kentucky v. Graham*, 473 U.S.

159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)).

14. The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 296–97, 111 S.Ct. 2321, 2322–23, 115 L.Ed.2d 271 (1991).

*Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)). The medical need of the prisoner must be objectively serious " '[b]ecause society does not expect that prisoners will have unqualified access to health care.' " *Id.* (alteration in original) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000). The subjective component of an Eighth Amendment claim alleging the deprivation of a serious medical need is satisfied by a showing of "deliberate indifference" by prison officials. *See Wilson,* 501 U.S. at 303, 111 S.Ct. at 2326–27 (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976)); *see also LaFaut v. Smith,* 834 F.2d 389, 391–92 (4th Cir.1987). "[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). Thus, the "deliberate indifference" standard recognizes a constitutional violation where prison officials know of and disregard an objectively serious condition, medical need, or risk of harm. *See id.* at 847, 114 S.Ct. at 1984 (holding that "a prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").

■ We conclude that the evidence, viewed in the light most favorable to the prisoners, cannot support a finding that Lanham and Galley were deliberately indifferent to the prisoners' serious medical needs.[15] Thus, summary judgment for Appellees on the prisoners' claims for injunctive relief was properly granted. First, there is no evidence to suggest that Lanham or Galley acted with

deliberate indifference to Appellant Granville Amos' need for pain medication. The record reveals that for a time in 1991, Amos (and other inmates) did not receive necessary medication in a timely fashion "due to the nondelivery by the Pharmacy." (J.A. at 888.) The record also shows that Amos filed several ARPs notifying Galley of the problem. Galley, however, took affirmative steps to ensure that Amos (and other inmates) received necessary medication on time. Each time Amos notified the Warden that he was not receiving his medication, Galley directed "the CMS Medical Provider to *insure* [sic] that this does not reoccur." (J.A. at 872.) When the problem with Pharmacy services persisted, Galley secured a "new Pharmacy." (J.A. at 888.) Nothing in the record so much as suggests that Lanham or Galley ignored or postponed addressing Amos' medical needs "out of mere convenience or apathy." *LaFaut,* 834 F.2d at 394. To the contrary, the record shows that prison officials acted quickly to remedy the problem brought to their attention by Amos. Accordingly, we hold that a reasonable jury could not conclude that Lanham or Galley exhibited deliberate indifference to Amos' medical needs, and that therefore the district court's grant of summary judgment in their favor on Amos' Eighth Amendment claim was appropriate. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Further, there is no evidence, either direct or circumstantial, to suggest that Lanham or Galley had any knowledge of the medical needs of Appellants William Smith, Michael Smith, and Boris Prymerman. The record establishes that these prisoners failed to file ARPs informing the Warden of their medical needs. Accordingly, there is no evidence that Lanham or Galley knew of and deliberately ignored their medical needs that could support a finding of deliberate indifference.[16] *See Farmer,* 511 U.S. at 837–38, 114

---

15. We do not address the objective component of the Eighth Amendment analysis, *i.e.,* whether the prisoners' medical needs are "sufficiently serious." Appellees apparently have conceded for purposes of this appeal that the prisoners' medical needs are sufficiently serious (or, more properly, have conceded that the evidence is sufficient

to create genuine issue of material fact on this question).

16. Moreover, none of these prisoners contended (or presented evidence to support a finding) that Lanham or Galley are liable in a supervisory capacity. *See Shakka v. Smith,* 71 F.3d 162, 167 n. 4 (4th Cir.1995); *Shaw v. Stroud,* 13 F.3d 791,

S.Ct. at 1979; *Shakka,* 71 F.3d at 167. Thus, no reasonable jury could conclude that Lanham or Galley exhibited deliberate indifference to the medical needs of Appellants William and Michael Smith, and Boris Prymerman. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Appellant Howard Megginson filed two ARPs informing the Warden of his recurring urinary tract infection. Thus, prison officials were aware of his medical need. Megginson failed, however, to produce evidence suggesting that Lanham or Galley was deliberately indifferent to his need for medical attention. Megginson himself stated, under oath, that after he filed ARPs, medical staff promptly responded and provided appropriate medical attention for his recurring urinary tract infection. As such, Megginson's Eighth Amendment claim is meritless; the evidence "is so one-sided that [Appellees] must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

█ Finally, like the other prisoners, Appellant Gary Ralph failed to raise a genuine issue of material fact over whether Lanham or Galley were deliberately indifferent to his medical needs. In an affidavit, Ralph stated that he was "scheduled for surgery while in prison four different times but I have never been provided the recommended surgery on my back." (J.A. at 159.) The evidence shows, however, that by June 27, 1995, Ralph was no longer incarcerated at RCI. As such, Ralph's prayer for declaratory and injunctive relief is moot. *See Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991) (holding that because prisoner was transferred to another facility and was no longer subjected to the conditions about which he complained, his claim for injunctive relief was moot); *Taylor v. Rogers,* 781 F.2d 1047, 1048 n. 1 (4th Cir.1986) (holding that prisoner's transfer mooted a request for declaratory and injunctive relief).

Even if Ralph's prayer for injunctive relief is not moot, he failed to attach supporting documents to his affidavit, or to forecast any evidence whatsoever supporting his claim that back surgery had been scheduled on

four occasions but never performed. Contrary evidence in the record reveals that specialists "recommended conservative treatment for [Ralph's] lumbosacral disc disease," not surgery. (J.A. at 602.) To avoid the entry of summary judgment, Ralph was required to demonstrate through "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that there was a genuine issue of material fact on each element on which he would carry the burden of proof at trial. *See* Fed.R.Civ.P. 56(c); *see also Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Ralph simply failed to carry this burden with respect to his allegation that he was deprived of necessary surgery. Even if Ralph were able to show that prison medical care providers scheduled but failed to perform necessary surgery, there is no evidence that Ralph filed ARPs apprising the Warden of the medical care providers' failure to provide the surgery. As a result, there is no evidence that Lanham or Galley knew of and deliberately ignored his allegedly serious need for back surgery that could support a finding of deliberate indifference. *See Farmer,* 511 U.S. at 837–38, 114 S.Ct. at 1979; *Shakka,* 71 F.3d at 167. If Ralph had been able to show that he was deprived of necessary surgery, he then may have had a colorable Eighth Amendment claim, not against Lanham and Galley, but against the prison medical care providers. *See West v. Atkins,* 487 U.S. 42, 54–56, 108 S.Ct. 2250, 2258–60, 101 L.Ed.2d 40 (1988) (holding that private physicians employed by state to provide medical services to inmates act "under color of state law" within the meaning of § 1983); *Conner v. Donnelly,* 42 F.3d 220, 224 (4th Cir.1994) (same); *cf. Richardson v. McKnight,* —— U.S. ——, ——, 117 S.Ct. 2100, 2108, 138 L.Ed.2d 540 (1997) (holding "that private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in

799 (4th Cir.1994); *Miltier v. Beorn,* 896 F.2d 848, 854–55 (4th Cir.1990).

a § 1983 case"). The private medical care providers, however, are not parties to this suit.[17]

■ Ralph also stated in his affidavit that he began suffering severe back and leg pain in June 1995, and that at some undesignated time he filed ARPs with the Warden requesting medical attention. The failure of Galley to provide Ralph with medical attention after his transfer from RCI on June 27, 1995, however, cannot constitute deliberate indifference. *Cf. Farmer*, 511 U.S. at 842–46, 114 S.Ct. at 1982–83 (characterizing deliberate indifference standard as "[a] prison official's duty under the Eighth Amendment" to the inmates in his care). As for Lanham, there is nothing in the record suggesting that he was aware of Ralph's back and leg pain. Moreover, the record reveals that Ralph received treatment at the University of Maryland Hospital after his transfer from RCI. We are satisfied that no reasonable jury could conclude that Lanham exhibited deliberate indifference to Ralph's medical needs. Accordingly, the district court did not err in granting summary judgment for Lanham and Galley on Ralph's Eighth Amendment claim. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

In sum, we find that Lanham and Galley acted reasonably in ensuring that the prisoners received appropriate medical attention and treatment. Because "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause," *Farmer*, 511 U.S. at 845, 114 S.Ct. at 1983, either for monetary damages (if sued in their personal capacities), or for equitable relief (if sued in their official capacities), we hold that the district court properly granted summary judgment for Appellees on the prisoners' Eighth Amendment claims.

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment for Appellees on the prisoners' statutory and constitutional claims.

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting in part:

I respectfully dissent in part. I disagree with Part II of the majority's opinion, which holds that section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West Supp. 1997), and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C.A. §§ 12131–12165 (West 1995 & Supp.1997), do not apply to state prisons. Both statutes explicitly state in unambiguous terms that they apply to all of the operations of every state government agency, department, and instrumentality. State correctional departments and prisons unquestionably fall within that statutory language. Accordingly, I would reverse the district court's grant of summary judgment to the Appellees on the Rehabilitation Act and ADA claims.

## I.

The district court granted summary judgment to the Appellees on the Rehabilitation Act and ADA claims on two grounds. First, the court relied on *dicta* in *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996), and held that the Rehabilitation Act and the ADA do not apply to state prisons. Second, the court held that even if the statutes do apply to state prisons, qualified immunity would bar the Appellants' claim for monetary damages. I would reverse the district court on both grounds. I address each argument in turn below.

## A.

As the district court and the majority opinion correctly note, we have not previously

---

**17.** Even if the private medical care providers were party to this suit, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976):

[T]he question whether an X-ray—or additional diagnostic techniques *or forms of treatment*—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court. . . .

*Id.* at 107, 97 S.Ct. at 293 (emphasis added).

decided whether the Rehabilitation Act and the ADA apply to state prisons. Although *Torcasio* involved similar Rehabilitation Act and ADA claims by a state prisoner, we ruled in favor of the prison officials only on the grounds of qualified immunity. We held that qualified immunity barred the prisoner's claims because it was not clearly established at the time of the alleged violations that the ADA and the Rehabilitation Act applied to state prisons. *See Torcasio,* 57 F.3d at 1343–52. We did not address the question at issue in the instant case, namely, whether the Rehabilitation Act and the ADA do apply to state prisons. That question presents an issue of first impression in the Fourth Circuit.

In order to answer that question, we must begin by examining the language of the statutes themselves. *See Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). When Congress uses unambiguous terms, we may not inquire beyond the statutory language. *Id.* The Supreme Court has held:

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete."

*Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted).

The plain language of the Rehabilitation Act and the ADA unambiguously provides that both statutes apply to all of the operations of every state government agency, department, and instrumentality. Specifically, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity* receiving Federal financial assistance." 29 U.S.C.A. § 794(a) (emphasis added). The statute defines "program or activity" as "*all* of the operations of ... a

department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance." *Id.* § 794(b)(1)(A) (emphasis added). A state correctional department such as the Maryland Department of Public Safety and Correctional Services ("MDPSCS") clearly constitutes a "department" or "agency" of a state, and a state prison such as the Roxbury Correctional Institution ("RCI") clearly falls within the "operations" of the MDPSCS. Section 504 clearly states that it applies to "any" such state entity, and thus the plain language of the statute does not suggest any exception for state prisons.

Title II of the ADA extends the prohibition against discrimination on the basis of disability to all services, programs, and activities that a "public entity" provides, regardless of whether the entity receives federal financial assistance. Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a *public entity,* or be subjected to discrimination by any such *entity.*" 42 U.S.C.A. § 12132 (emphasis added). The statute defines "public entity" as "any State or local government" and "*any* department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1)(A),(B) (emphasis added). Again, state correctional departments and state prisons clearly constitute departments or instrumentalities of a state, and Title II's broad language does not suggest any exception for state prisons.

In accordance with the plain language of the statutes, the vast majority of courts that have addressed the issue have held that section 504 of the Rehabilitation Act and Title II of the ADA do apply to state prisons. *See Yeskey v. Pennsylvania Dep't of Corrections,* 118 F.3d 168, 170–74 (3d Cir.1997) (holding that section 504 of the Rehabilitation Act and Title II of the ADA apply to state prisons); *Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 483–87 (7th Cir.1997) (same); *Duffy v. Riveland,* 98 F.3d 447, 453–55 (9th Cir.1996) (same); *Lue v. Moore,* 43 F.3d

1203, 1205 (8th Cir.1994) (holding that section 504 of the Rehabilitation Act applies to state prisons); *Gates v. Rowland,* 39 F.3d 1439, 1446 (9th Cir.1994) (same); *Harris v. Thigpen,* 941 F.2d 1495, 1522 n. 41 (11th Cir.1991) (same); *Bonner v. Lewis,* 857 F.2d 559, 561–62 (9th Cir.1988) (same). Only one court of appeals has held that the Rehabilitation Act and the ADA do not apply to state prisons. *See White v. Colorado,* 82 F.3d 364, 367 (10th Cir.1996) (holding that section 504 of the Rehabilitation Act and Title II of the ADA do not apply to employment discrimination claims brought by state prison inmates).

Although the majority opinion in the instant case concedes that the statutory language is broad and inclusive and that the legislative histories of the Rehabilitation Act and the ADA do not forbid application to state prisons, it argues that the statutes do not apply to state prisons because the statutes do not clearly and explicitly state that they apply to state prisons. I agree with the majority that Congress must speak clearly in the statutory text when it intends to alter the traditional balance between the states and the federal government. *See Gregory v. Ashcroft,* 501 U.S. 452, 460–61, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991). I also agree with the majority that the operation of state prisons is an area traditionally reserved to the states. *See Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837–38, 36 L.Ed.2d 439 (1973). However, the Supreme Court has made it plain that courts should apply the so-called "clear statement rule" as a canon of statutory construction only when the statutory text is ambiguous and furnishes little guidance as to whether Congress intended to subject state agencies to potential liability. *See Gregory,* 501 U.S. at 470, 111 S.Ct. at 2406 (describing the clear statement rule as "a rule of statutory construction to be applied where statutory intent is ambiguous"); *EEOC v. Wyoming,* 460 U.S. 226, 244 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) (holding that the clear statement rule is "a tool with which to divine the meaning of otherwise ambiguous statutory intent"). The Court has held that

the clear statement rule simply does not apply when the statutory text is clear and "there is no doubt what the intent of Congress was." *EEOC,* 460 U.S. at 244 n. 18, 103 S.Ct. at 1064 n. 18. The clear statement rule simply is "not a warrant to disregard clearly expressed congressional intent." *Yeskey,* 118 F.3d at 173.

Congress made its intent unmistakably clear with regard to the Rehabilitation Act and the ADA. As noted above, the Rehabilitation Act specifically provides that it applies to *"all* of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government," 29 U.S.C.A. § 794(b)(1)(A) (emphasis added), and the ADA explicitly states that it applies to *"any* department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C.A. § 12131(1)(B) (emphasis added). State correctional departments and state prisons clearly constitute "department[s]" or "instrumentalit[ies]" of the state, and the statutes clearly provide that they apply to *all* such state entities.

The majority suggests that Congress cannot make the Rehabilitation Act and the ADA applicable to state prisons or to other areas traditionally reserved to the states unless it separately lists each state agency that the statutes apply to in the statutory text. The Supreme Court, however, has expressly rejected such a requirement. *See Gregory,* 501 U.S. at 467, 111 S.Ct. at 2404 ("This does not mean that the Act must mention judges explicitly."). Congress only needs to make the scope of a statute "plain." *Id.* Congress made the scope of the Rehabilitation Act and the ADA plain when it specifically provided that both statutes apply to state and local governments and "any" or "all" of their operations. As Judge Posner noted in *Crawford,* 115 F.3d at 485, "[w]e doubt ... that Congress could speak much more clearly than it did when it made the [ADA] expressly applicable to all public entities and defined the term 'public entity' to include every possible agency of state or local government." *

---

* I also note that I am not persuaded by the majority's citation to *Virginia Dep't of Education v. Riley,* 106 F.3d 559, 567 (4th Cir.1997) *(en*

*banc),* in support of their argument that we should apply the clear statement rule in the instant case. In that case, we examined a provi-

Moreover, I do not agree with the majority that the Rehabilitation Act and the ADA exclude prisoners from coverage because the statutes only protect "qualified individual[s]" with a disability. The ADA defines that phrase as "an individual with a disability who, with or without reasonable modifications ..., meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131(2). The terms "eligibility" and "participation" do not, as the majority opinion argues, imply voluntariness and thus exclude prisoners who by definition are involuntary participants. To the contrary, "eligible" simply refers to those who are "fitted or qualified to be chosen," *see* Webster's Third New International Dictionary 736 (1993), without regard to the individual's choice. The fact that prisoners participate in prison activities involuntarily does not mean that they do not participate. Congress clearly intended the statutes to apply even in "involuntary" contexts. In its findings demonstrating the need for the ADA, Congress expressly stated in the statutory text that "discrimination against individuals with disabilities persists in such critical areas as ... *institutionalization*." 42 U.S.C.A. § 12101(a)(3) (West 1995) (emphasis added). *See also Yeskey,* 118 F.3d at 173 (rejecting the state's argument that the Rehabilitation Act and the ADA exclude coverage for prisoners because they are not "qualified individuals" and holding that "[t]he terms 'eligibility' and 'participation' do not

... 'imply voluntariness' or mandate that an individual seek out or request a service to be covered"); *Bonner,* 857 F.2d at 563 (holding that a state prisoner was a "qualified individual" within the meaning of section 504 of the Rehabilitation Act even though his participation in prison activities was "sometimes required").

Indeed, the majority's suggestion that the Rehabilitation Act and the ADA do not apply to obligatory or mandatory programs and services leads to anomalous results. The "voluntary" limitation that the majority opinion imposes would immunize discrimination on the basis of disability in the provision of compulsory services such as public education, mandatory vaccinations, and jury service. Yet several courts, including the Fourth Circuit, have indeed applied the statutes to such mandatory and "involuntary" programs. *See, e.g., DeVries v. Fairfax County Sch. Bd.,* 882 F.2d 876, 880 (4th Cir.1989) (applying section 504 of the Rehabilitation Act to public schools); *Galloway v. Superior Court of the District of Columbia,* 816 F.Supp. 12, 15–19 (D.D.C.1993) (holding that section 504 of the Rehabilitation Act and Title II of the ADA apply to jury service).

In holding that the Rehabilitation Act and the ADA apply to state prisoners, Judge Posner noted:

It might seem absurd to apply the Americans with Disabilities Act to prisoners. Prisoners are not a favored group in society; the propensity of some of them to sue at the drop of a hat is well known;

---

sion of the Individuals with Disabilities Education Act (the "IDEA") that required states to have a policy in effect "that assures *all* children with disabilities the right to a free appropriate public education," 20 U.S.C.A. § 1412 (West Supp.1997)(emphasis added), in order to receive federal educational funds. Despite the broad and inclusive statutory language, a majority of the *en banc Riley* Court concluded that the provision was ambiguous, applied the clear statement rule, and held that the federal government may not require states to provide educational services to disabled children who are expelled for misconduct. As the majority opinion in the instant case notes, the *Riley* Court based its holding on its conclusion that not "a single word from the statute or from the legislative history of [the] IDEA evidence[s] that Congress even considered" requiring states to continue providing educational services to such children. *Riley,* 106

F.3d at 567. Based on the clear statutory language of § 1412, however, I dissented. *See id.* at 575 ("I have concluded that 'all' means 'all.'").

Less than four months after we decided *Riley,* Congress amended § 1412 of the IDEA. Section 1412 now provides that in order to receive federal educational funds, states must demonstrate that they have policies in effect that ensure that "[a] free appropriate public education is available to *all* children with disabilities residing in the State between the ages of 3 and 21, inclusive, *including children with disabilities who have been suspended or expelled from school.*" IDEA Amendments for 1997, Pub.L. No. 105–17, § 612, 111 Stat. 37, 60 (emphasis added). Congress specifically noted in the legislative history that the amendment was merely a "clarification[ ]," not a change, to § 1412. S.Rep. No. 105–17, at 11 (1997). Thus, the majority's reliance on *Riley* is questionable.

prison systems are strapped for funds; the practical effect of granting disabled prisoners rights of access that might require costly modifications of prison facilities might be the curtailment of educational, recreational, and rehabilitative programs for prisoners, in which event everyone might be worse off. But ... there is another side to the issue. The Americans with Disabilities Act was cast in terms not of subsidizing an interest group but of eliminating a form of discrimination that Congress considered unfair and even odious. The Act assimilates the disabled to groups that by reason of sex, age, race, religion, nationality, or ethnic origin are believed to be victims of discrimination. Rights against discrimination are among the few rights that prisoners do not park at the prison gates. Although the special conditions of the prison setting license a degree of discrimination that would not be tolerated in a free environment, there is no general right of prison officials to discriminate against prisoners on grounds of race, sex, religion, and so forth. If a prison may not exclude blacks from the prison dining hall and force them to eat in their cells, and if Congress thinks that discriminating against a blind person is like discriminating against a black person, it is not obvious that the prison may exclude the blind person from the dining hall.

*Crawford,* 115 F.3d at 486 (citations omitted). I agree. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1). *See also Alexander v. Choate,* 469 U.S. 287, 295–97, 105 S.Ct. 712, 717–18, 83 L.Ed.2d 661 (1985) (discussing the broad nondiscrimination goals of the Rehabilitation Act). Applying the Rehabilitation Act and the ADA to state prisons, pursuant to the clear and unambiguous statutory text, furthers the broad remedial goals that underlie both statutes.

In sum, the plain language of the Rehabilitation Act and the ADA and the remedial purposes underlying both statutes clearly demonstrate that the statutes apply to state prisons. The district court therefore erred when it granted summary judgment to the Appellees on those claims on the ground that the statutes do not apply to state prisons.

### B.

The district court also relied on our actual holding in *Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996), and granted summary judgment to the Appellees on the alternative ground that even if the Rehabilitation Act and the ADA do apply to state prisons, qualified immunity would bar the Appellants' claims for monetary damages under the two statutes. In *Torcasio,* a state prisoner sued prison officials in their personal capacity pursuant to section 504 of the Rehabilitation Act and Title II of the ADA. We held that qualified immunity barred the prisoner's claims because it was not clearly established at the time of the alleged violations that the ADA and the Rehabilitation Act applied to state prisons. *See id.* at 1343–52.

Qualified immunity bars suits against state officials in their *personal* capacity. Courts developed the doctrine to alleviate the risk that officials' fear of personal liability might unduly inhibit them in the discharge of their duties. *See Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). Thus, when a plaintiff sues state officials in their personal capacity, qualified immunity protects the officials "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 638, 107 S.Ct. at 3038.

Unlike the plaintiff in *Torcasio,* however, the Appellants in the instant case sued two state governmental entities (the MDPSCS and RCI) and two state officials (Richard Lanham and John Galley) in their *official,* representative capacities only. Sovereign immunity, rather than qualified immunity, bars suits in federal courts against state entities and state officials in their official capacity without the state's consent. *See Seminole Tribe of Fla. v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996); *Adden v. Middlebrooks,* 688 F.2d 1147, 1153–54 (7th Cir.1982) (holding that

**617**

sovereign immunity barred a wrongful death suit against a state correctional department in federal court); *Jones v. Smith,* 784 F.2d 149, 152 (2d Cir.1986) (holding that sovereign immunity barred a § 1983 suit for monetary damages against a prison official in his official capacity).

The Supreme Court has held, however, that Congress may abrogate the states' sovereign immunity if it unequivocally expresses its intent to abrogate the immunity and has acted pursuant to a valid exercise of power, such as section 5 of the Fourteenth Amendment. *See Seminole Tribe of Fla.,* —— U.S. at ——, 116 S.Ct. at 1125. Congress clearly expressed its intent to abrogate the states' sovereign immunity under the Rehabilitation Act and the ADA. *See* 42 U.S.C.A. § 2000d–7(a)(1) (West 1994) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."); 42 U.S.C.A. § 12202 (West 1995) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of [the ADA.]"). Moreover, Congress passed section 504 of the Rehabilitation Act and Title II of the ADA pursuant to its powers under section 5 of the Fourteenth Amendment. *See Welch v. Texas Dep't of Highways and Public Transp.,* 483 U.S. 468, 472 n. 2, 107 S.Ct. 2941, 2945 n. 2, 97 L.Ed.2d 389 (1987); 42 U.S.C.A. § 12101(b)(4).

Thus, sovereign immunity, rather than qualified immunity, potentially barred the Appellants' claims in the instant case. However, Congress clearly abrogated the states' sovereign immunity under the Rehabilitation Act and the ADA and thus clearly authorized damage claims against state entities and state officials sued in their official capacity. The district court therefore erred when it granted summary judgment to the Appellees on the Rehabilitation Act and ADA claims on the alternative ground that qualified immunity barred the Appellants' claim for damages under the two statutes.

**II.**

Accordingly, I would reverse the district court's grant of summary judgment to the Appellees on the Rehabilitation Act and ADA claims. I would hold that the Rehabilitation Act and the ADA apply to state prisons and that qualified immunity does not bar the Appellants' claims. Since the district court only addressed the threshold questions of the applicability of the statutes and the Appellees' qualified immunity defense, I would remand for the district court to address the merits of the Appellants' statutory claims in the first instance. I dissent.